UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FEDERAL HOME LOAN MORTGAGE,

      Plaintiff/Counter-Defendant,

                                              Case No. 04-60198
                                              Hon. Marianne O. Battani

v.

JON R. HULET and JOANNE M. HULET,

      Defendants/Counter-Plaintiffs
      Third-Party Plaintiffs,

v.

GTJ CONSULTING, LLC and
RE/MAX TEAM 2000,

      Third-Party Defendants.
_____

OPINION AND ORDER GRANTING
THIRD-PARTY DEFENDANT GTJ CONSULTING, LLC'S
MOTION FOR SUMMARY JUDGMENT REGARDING ALL CLAIMS AND
PLAINTIFF/COUNTER-DEFENDANT FEDERAL HOME LOAN MORTGAGE'S
MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DAMAGES

I.    Introduction

      Before the Court are two motions for summary judgment: (1) Third-Party Defendant GTJ

Consulting, LLC's ("GTJ") motion for summary judgment regarding all claims, and

(2) Plaintiff/Counter-Defendant Federal Home Loan Mortgage's ("Freddy Mac") motion for

summary judgment with respect to damages only. In regard to GTJ's motion, Third-Party

Defendant Re/Max ("Re/Max") and Freddy Mac have filed responses agreeing with its argument

1

and requesting that this Court grant the motion. Additionally, GTJ and Re/Max have filed responses concurring with Freddy Mac's motion regarding damages, and request that this Court grant that motion as well. The Court agrees with GTJ and Freddy Mac's arguments, and for the reasons stated below, **GRANTS** both parties' motions for summary judgment.

## II.     Statement of Facts

This Court has reviewed the facts in the light most favorable to the non-movant, in this case, Defendants/Counter-Plaintiffs/Third-Party Plaintiffs Jon R. Hulet and Joanne M. Hulet (collectively, the "Hulets"). The Hulets owned a house at 37187 Menton, Romulus, Michigan, until October 15, 2003, when it was foreclosed and subsequently purchased by Freddy Mac, as a result of a mortgage held by Chase Manhattan Mortgage Company ("Chase"). Although Freddy Mac purchased the home on that day, its actual ownership did not vest until the redemption period expired on April 15, 2004. Following is an outline of the events that led to the foreclosure.

On September 17, 1998, the Hulets entered into a mortgage with Alta Mortgage in the amount of $130,500.00 for the Menton Street property (mortgage recorded November 2, 1998). The mortgage was then assigned to Chase (March 22, 2002). During the next few years, the Hulets became delinquent on their mortgage payments. In order to preserve their home ownership, they entered into a Mortgage Modification Agreement with Chase (March 19, 2002 agreement; agreement recorded on May 7, 2002).

Within months of the modification, the Hulets became dissatisfied with the agreement because Chase had failed to provide them with an accounting of their payments. They began to withhold payments until they received an accounting. Because they feared garnishment, they

kept cash in a safe at their Menton home to cover those payments. According to the Hulets, they never received the requested accounting from Chase, and on October 15, 2003, the house went into foreclosure. The Hulets had until April 15, 2004, to redeem their property. (On June 11, 2003, the Hulets were forced to file bankruptcy.) Approximately one year before, in August 2002, Mr. Hulet's father died. According to the estate attorney, the Hulets were entitled to receive money from the estate, but they testified that they were not sure if they would receive any. However, the documents submitted by GTJ demonstrate that on or around November 1, 2003, the Hulets received $72,046.99. The Hulets did not redeem the property nor did they include the inheritance information in the statements filed with the bankruptcy court.

The Hulets testified that on December 22, and 23, 2003, they started moving furniture and clothing from the Menton house to their new home in Northville. They used a U-Haul truck initially, and hired Two Men and a Truck to move the remaining items. In her deposition, Ms. Hulet stated that by January 2004, she and her children, except for her eldest son, were living in Northville in order for the children to attend the Northville School District. Mr. Hulet commuted between two residences–the one in Northville and apparently one in Taylor, Michigan.

Despite the move to Northville, the Hulets said that they left money in a safe and some personal property at the Menton home. They testified that their eldest son remained at the Menton residence until early February 2004. From the record presented, the Hulets' homeowners insurance expired on February 2, 2004. They testified that they were out of town from February 5, 2004, to February 13, 2004.

Freddy Mac hired Re/Max to manage and sell the Menton Street property, and on

3

February 5, 2004, it inspected the home.  Re/Max stated that when its agent arrived at the Menton home on that day, it was abandoned.  It then contacted GTJ, a property and construction management company specializing in foreclosed homes, and ordered GTJ to secure the Menton Street property by rekeying it.  Re/Max also ordered GTJ to winterize the property.  Freddy Mac uses GTJ regularly to preserve and maintain Freddy-Mac-owned properties, to rekey locks, winterize homes, remove snow, and cut lawns.

On February 6, 2004, Kyle Johnson, one of GTJ's employees, went to the Menton property to secure and winterize it.  Upon arrival, Mr. Johnson found the home vacant.  In order to gain entry, he had to remove about six inches of snow from the driveway and the sidewalk. Because the property appeared abandoned, he took pictures to show the disarray found when he entered the home.  Once Mr. Johnson finished the job, he posted a notice on the window stating that the property had been winterized and rekeyed.  After that, GTJ said that they had no further contact with the house until the redemption period expired.

One week after GTJ winterized the home, Ms. Hulet received a phone call from a neighbor–Kandie Moore.  Ms. Moore called her to let her know that there were people at the Menton property removing their belongings.  According to Ms. Moore, there were three people carrying the Hulets' personal property into a dark blue pickup truck.  She testified that she walked over to them and asked them what they were doing.  She was told that they were hired by the mortgage company as a cleanup crew.  She told them that they should be careful because the Hulets had not moved out yet.  The crew told her, "we're just doing our job ma'am."  (Moore Dep. pp. 15-20.)  Ms. Moore described the men as all wearing jeans and T-shirts, and one of the individuals that she spoke with had long red hair.  GTJ said that none of those descriptions

4

described any of its employees; GTJ's employees wear uniforms with the GTJ logo and drive a white truck with the GTJ logo.

After Ms. Hulet's conversation with Ms. Moore, Mr. Hulet went to the home and found that the front door was broken into and that a screen window had been sliced open. He said the inside of the home was trashed. Ms. Hulet never entered the Menton house after the incident. The Hulets allege that approximately $42,000 in cash and property were removed from the home. GTJ denies any involvement.

On April 26, 2004, Freddy Mac filed a complaint against the Hulets to evict them from the premises. On May 6, 2004, it obtained a landlord-tenant judgment. The Hulets filed a counterclaim against Freddy Mac alleging a violation of the Michigan Anti-Lockout Statute, MICH. COMP. LAWS § 600.2918 (which allows for treble damages), trespass of chattels, and conversion. Later, they filed an amended complaint, adding GTJ and Re/Max as third-party defendants, and adding claims for wrongful eviction and detainer, and tortious infliction of severe emotional distress.

A police report regarding the February 6, 2004, incident was not filed until May 11, 2004, after Freddy Mac filed its complaint for eviction.

**III.   Standard of Review**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986), the United States Supreme Court stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *Hager v. Pike County Bd. of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra* at 325.

Once the moving party carries that burden, the burden shifts to the non-moving party to set forth material facts showing a genuine triable issue. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). The court should view the evidence in a light most favorable to the non-movant and draw all reasonable inferences in the nonmovant's favor. *Sagan v. U.S.*, 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). To create a genuine issue of material fact, the nonmovant must do

more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, *supra* at 249-50. "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The evidence itself need not be the sort admissible at trial. *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000). However, the evidence must be more than the non-movant's own pleadings and affidavits. *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001). The mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. *Anderson, supra* at 252.

**IV.   Analysis**

    **A.   The Parties' Arguments**

The parties make numerous arguments in their motions. First, GTJ argues that it did not unlawfully enter and remove the Hulets' property from the Menton house. It says that the only eyewitness to the removal of the property, Ms. Kandie Moore, did not identify any of its workers. Moreover, it is GTJ's position that the early entry into the home was not improper, as it had a good-faith belief that the property was abandoned and it had the right to enter the property to secure and winterize it. Freddy Mac and Re/Max concur with GTJ.

Next, Freddy Mac argues that because the Hulets did not schedule as assets these claims against them, they should be judicially estopped from prosecuting their suit and that the

action must be dismissed. *Payless Wholesale Distribs., Inc. v. Alberto Culver, Inc.* 989 F.2d 570 (1st Cir. 1993) (holding that debtor, who failed to announce his claim against a creditor during his Chapter 11 bankruptcy case, was judicially estopped from subsequently litigating the cause of action.) Further, Freddy Mac contends that the Hulets should be held to their signed statements, made in their Chapter 7 proceeding, which they swore were true and correct. It argues that the statements the Hulets now make are false and that the Hulets did not list the cash and property they now allege to be as assets in their bankruptcy action. GTJ and Re/Max concur in Freddy Mac's position.

Next, the Hulets argue that GTJ entered their property before the redemption period, in violation of the Michigan Anti-Lockout Statute. Freddy Mac did not obtain a landlord-tenant judgment until May 6, 2004, and according to the judgment, they had until May 15, 2004 to vacate the premises. Therefore, they allege Freddy Mac, GTJ and Re/Max were all in violation of the statute when Re/Max ordered GTJ to change the locks and winterize the Menton property.

Finally, the Hulets argue that judicial estoppel is not appropriate because the property and cash listed in their bankruptcy proceedings were approximations, and any errors were unintentional and a mistake. During oral argument, the Hulets' attorney could not account, on behalf of the Hulets, for the discrepancies between the cash value and property now listed with that listed on the bankruptcy statements.

        B.      **Wrongful Eviction Under MICH. COMP. LAWS § 600.2918**

The Hulets' primary basis for relief is pursuant to the Michigan Anti-Lockout Statute,

which states in pertinent part:

> (1) Any person who is ejected or put out of any lands or tenements in a forcible and unlawful manner, or being out is afterwards held and kept out, by force, if he prevails, is entitled to recover 3 times the amount of his actual damages or $200.00, whichever is greater, in addition to recovering possession.
> (2) Any tenant in possession of premises whose possessory interest has been unlawfully interfered with by the owner, lessor, licensor, or their agents shall be entitled to recover the amount of his actual damages or $200.00, whichever is greater, for each occurrence and, where possession has been lost, to recover possession. Unlawful interference with a possessory interest shall include:
>
>> (a) The use of force or threat of force.
>> (b) The removal, retention, or destruction of personal property of the possessor.
>> (c) A change, alteration, or addition to the locks or other security devices on the property without forthwith providing keys or other unlocking devices to the person in possession.
>> (d) The boarding of the premises which prevents or deters entry.
>> (e) The removal of doors, windows, or locks.
>
>> \* \* \*
>
> (3) The provisions of subsection (2) shall not apply where the owner, lessor, licensor, or their agents can establish that he:
>
>> (b) Interfered temporarily with possession only as necessary to make needed repairs or inspection and only as provided by law or
>> (c) Believed in good faith the tenant had abandoned the premises, and after diligent inquiry had reason to believe the tenant does not intend to return, and current rent is not paid.

The Hulets have not presented facts in violation of the statute and cannot sustain their burden-shift. Here, GTJ did not deny that one of its employees entered the Menton home on February 6,

2004, to provide necessary services to preserve the premises during the winter months. It argued that that action was only taken upon a good-faith belief that the premises had been abandoned with no intent to return. The Court finds there is uncontroverted evidence to support such a good-faith belief.

The house was not being maintained, as was evidenced by the city's posted notices regarding the walkway that needed shoveling, and the photographs taken by Mr. Johnson. Both Re/Max and GTJ's inspection of the property showed no activity in the house. The Hulets did not come forth with any evidence to rebut GTJ's contention that its workers were not on the premises the day Ms. Moore allegedly witnessed people removing property from their home. Furthermore, the Hulets' homeowners insurance policy expired on February 2, 2004, another indication that they did not intend to return to the home. In fact, the Hulets themselves testified that they ceased living at the Menton house for at least one month prior to the alleged incident. According to their deposition testimony, they had already moved the majority of their personal property and they were living full-time in Northville. The only evidence presented that anyone was living at the Menton Street property was the unsupported testimony from the Hulets who claimed their eldest resided there.

Viewing the evidence in a light most favorable to the Hulets, this Court finds that it is insufficient to support their claim. The Hulets have failed to present evidence which would create a question of material fact whether GTJ entered their property unlawfully and removed their personal belongings in violation of the Michigan Anti-Lockout Statute.

    **C.**    **Intentional Tort Claims and Wrongful Eviction and Detainer Claim**

It is the Hulets' position that GTJ, by entering onto their property and changing the locks

on their home, committed a trespass. And, by removing certain property, GTJ not only deprived them access to their personal property, it also exerted wrongful dominion over that property and converted that property to its own use. They solely rely on Ms. Moore's testimony for support. However, there is nothing in Ms. Moore's testimony, or for that matter, in Mr. Hulet's description of the premises, that implicates GTJ. The Hulets cannot satisfy the elements necessary to prove their intentional tort claims.

This Court finds that there is insufficient evidence to hold GTJ responsible for the claimed torts. Therefore, there is no basis to conclude that GTJ is liable for any of the damages for the Hulets' loss of their personal property. The Court **GRANTS** GTJ's motion for summary judgment on all claims.

### D.  Judicial Estoppel

Freddy Mac moves to dismiss the claim against it on the basis of judicial estoppel. Federal cases have defined the doctrine of judicial estoppel as:

> The doctrine of judicial estoppel applies to one who makes a sworn statement of fact in a formal legal proceeding which he undertakes to contradict in a later judicial proceeding. The previous sworn statement of fact is not merely evidence against the party, but rather precludes him from denying its truth. It is treated not as an admission against interest but instead as an absolute bar to the party denying the truth of his previous sworn statements. *Prince v. Allstate Ins. Co.*, 2002 U.S. District Lexis 26889 (June 14, 2002).

Michigan's definition of judicial estoppel is essentially the same as that of the federal courts. In addition, Michigan Courts seem to emphasize the important aspect of the judicial and public policy that justifies the doctrine.

11

> The Sixth Circuit has said that judicial estoppel exists to protect the courts from perversion of judicial machinery through parties attempt to take advantage of both sides of a factual issue at different stages of a judicial proceeding. The doctrine is utilized to preserve the integrity of the courts by preventing a party from abusing the judicial process through a cynical gamesmanship. (Citations omitted.)

In *New Hampshire v. Maine*, 532 U.S. 742 (2001), the United States Supreme Court articulated the necessary factors for applying the equitable doctrine of judicial estoppel to a case. Those factors are as follows: (1) A party's later position must be clearly inconsistent with its earlier position, (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Judicial estoppel forbids use of intentional self contradiction as a means of obtaining unfair advantage. The Court is persuaded that Freddy Mac is entitled to summary judgment on the basis of judicial estoppel.

In the present case, the Hulets have taken a position which is contrary to their bankruptcy schedules. They testified in their depositions in this case that they had $10,000 in cash located in a safe at the Menton Street home which they left at that property. They testified that the cash was there in June 2003, when they filed for bankruptcy. Yet, they signed the bankruptcy schedules

indicating that no such funds existed. Furthermore, the Hulets failed to account in bankruptcy for the inheritance money received from Mr. Hulet's father's estate.

Whether the Hulets had the sum of cash in their safe in June 2003, and at the time of the


alleged wrongful entry, would normally be a fact question for the jury.  However, in this particular situation, it is a question for this Court to decide, because it is a statement in opposition to a prior sworn bankruptcy statement.  While the Hulets now allege a misunderstanding of the amount of the cash, they had not amended their schedules as required by bankruptcy law.  Fed.R.Bankr.P. 1009.  Rather, the week before oral argument on GTJ and Freddy Mac's motions, the Hulets filed a motion with the bankruptcy court to reopen their case and amend their schedules.  Those papers were presented to this Court on the day of oral argument.

For the reasons stated, this Court finds that the Hulets have failed to come forward with sufficient evidence to support their claims.  Therefore, Freddy Mac's motion for summary judgment with respect to damages is **GRANTED.**

**V.**     **Conclusion**

On the basis of the above, this Court **GRANTS** both motions for summary judgment..


**IT IS SO ORDERED.**


                                             s/Marianne O. Battani
                                             MARIANNE O. BATTANI
                                             UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon Willienard Banks, Charles L. Hahn, Mark Stern, and John Lynch on this date by electronic filing.

<p style="text-align:right">s/Bernadette M. Thebolt<br>DEPUTY CLERK</p>